# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BANCROFT GLOBAL
DEVELOPMENT, *et al.*,                     :
                                           :
    Plaintiffs,          :          Civil Action No.:     17-395 (RC)
                                           :
    v.                   :          Re Document No.:      42
                                           :
UNITED STATE OF AMERICA, *et al.*,         :
                                           :
    Defendants.          :

## <u>MEMORANDUM OPINION</u>

### Granting in Part and Denying in Part Defendants' Motion for Partial Dismissal

## I. INTRODUCTION

Plaintiffs Bancroft Global Development, Michael Stock, and Melissa Bates Stock seek the return of documents seized during the execution of a search warrant in 2011, as well as money damages for the allegedly unlawful disclosure of their confidential tax return information. In particular, Plaintiffs allege that employees of several federal agencies told employees of other federal agencies that Plaintiffs were being audited, the likely result of the audit, and commented about Plaintiffs' behavior during the audit. Additionally, Plaintiffs allege that the government agencies that had originally seized their confidential tax information gave a portion of those documents to another undisclosed government agency without the legal authority to do so. The Government has moved to dismiss each of Plaintiffs' unlawful disclosure claims on the grounds that they are either time-barred or insufficiently pleaded. For the reasons stated below, the Court dismisses Counts III and VII of Plaintiffs' Second Amended Complaint for failure to state a claim and dismisses Mr. and Mrs. Stocks' claims in Count VI and a portion of Count IV for lack of standing.

## II. FACTUAL BACKGROUND[1]

Plaintiff Bancroft Global Development ("Bancroft") is a nonprofit corporation that "provides education and training for foreign governments and international organizations in disciplines such as explosive ordnance disposal, emergency medicine, and law enforcement, in order to protect civilians and help such areas recover and develop economically." 2d Am. Compl. ¶¶ 13–14, ECF No. 36. Plaintiff Michael Stock serves as Bancroft's President and Director, and Plaintiff Melissa Bates Stock serves as its Secretary and Director. *Id.* ¶¶ 15–16. Bancroft's work involves a substantial amount of classified information and material that it receives from the federal government. *Id.* ¶ 22. Certain members of Bancroft's staff, including Mr. and Mrs. Stock, have been granted "clearances for extremely sensitive classified information," which allows them access to classified material relating to specific government programs or contracts. *Id.* ¶¶ 22–23. Additionally, the government has allowed Bancroft to store and process classified materials in certain locations in its offices. *Id.* ¶ 24.

Despite these clearances and authorizations, in 2011, the Federal Bureau of Investigation ("FBI") and Immigration and Customs Enforcement ("ICE") began investigating Bancroft for potential violations of 18 U.S.C. § 1924, concerning the unauthorized removal or retention of classified documents or material. *Id.* ¶ 25. In furtherance of that investigation, on November 9, 2011, the FBI and ICE executed three search warrants: two authorizing the seizure of property in Bancroft's D.C. offices and one authorizing the seizure of property in Mr. and Mrs. Stock's home in McLean, Virginia. *Id.* ¶ 26. The FBI and ICE seized a multitude of records belonging to Bancroft and the Stocks, including both hard copy records and electronic files. *See id.* ¶¶ 27–30.

---

[1] At the motion to dismiss stage, the Court accepts the plaintiffs' factual allegations as true. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

Soon thereafter, the Internal Revenue Service ("IRS") began an audit of Bancroft's 2008, 2009, and 2010 tax returns. *Id.* ¶ 31. In furtherance of that audit, the IRS issued formal Information Document Requests seeking records that would establish the accuracy of Bancroft's tax returns during those years. However, because the FBI and ICE had seized most of Bancroft's hard copy and electronic records, Bancroft was unable to comply with the IRS's requests. *Id.* ¶ 32. In an attempt to comply with the requests, Bancroft wrote to Assistant U.S. Attorney Jonathan Malis about the status of the seized records, explaining that the government's retention of the documents prevented Bancroft from complying with the IRS's Information Document Requests. Mr. Malis did not grant Bancroft access to the relevant materials. *Id.* ¶ 33.

Due in part of Bancroft's inability to comply with the Information Document Requests, the IRS opened an additional audit into Mr. and Mrs. Stock's personal tax returns for the same years. *Id.* ¶ 34. Again, Mr. and Mrs. Stock found themselves unable to comply with the requests because many of the documents they would need to submit in order to comply remained in government custody. *Id.* ¶ 35. In April 2013, IRS Revenue Agent Rene Hammett, the agent assigned to the two audits, contacted Plaintiffs' counsel inquiring about the status of the IRS's outstanding Information Document Requests. *Id.* ¶ 36. She informed Plaintiffs' counsel that she understood that many of the responsive records remained in government custody and were now in the possession of the U.S. Attorney's Office, and explained that Elizabeth Henn, counsel for the IRS, had contacted the Office in an attempt to resolve this issue. *Id.* ¶ 37. Despite these efforts, it would be another three months before any of Plaintiffs' seized records would be returned to them. *Id.* ¶ 40.

In May 2013, Plaintiffs were informed that the Department of Justice had closed its criminal investigation of Plaintiffs. *Id.* ¶ 41. Jay Bratt, Deputy Chief of the National Security

Section, told Plaintiffs' counsel that the government would return all unclassified records it had

collected for purposes of the investigation to Plaintiffs' counsel, but would send all classified

records it had collected to an unidentified government agency. *Id.* ¶ 42. However, when Plaintiffs

received a portion of the seized records in July 2013, they noticed that: (1) "the inventory of

returned materials did not include all of the seized unclassified property, . . . including critical

financial information needed to respond to the ongoing audits"; (2) "highly classified material

had been commingled with unclassified records while in Government custody," resulting in the

transmission of certain unclassified records to the unidentified government agency; (3) "the

returned materials included materials clearly marked as classified"; (4) the government's

inventory of items initially seized, and items returned, contained errors; and (5) "electronic

media had been wiped clean of all its data, and physical items had been destroyed while in FBI

custody." *Id.* ¶ 44. "In light of these problems, Plaintiffs still did not have access to sizeable

amounts of information needed to respond to the ongoing audits." *Id.* ¶ 49. Indeed, as of the

filing of their Second Amended Complaint, Plaintiffs still had not received many of the

unclassified records and nearly all of the classified records that the Government had seized. *See*

*id.* ¶ 64.

When Plaintiffs attempted to obtain the remainder of the seized documents, the

government did not acknowledge that it had retained or released any documents in error. *Id.* ¶¶

50–51. However, two years later, on June 24, 2015, ICE Special Agent John Dietrich delivered

two more boxes of "miscellaneous documents," including a portion of the seized tax returns and

return information, to Bancroft's office. *Id.* ¶ 52. While Special Agent Dietrich was returning the

boxes, Plaintiffs noticed that he appeared to be aware of the "existence, status, scope, and

anticipated outcome of the IRS audit." *Id.* ¶ 89.

Plaintiffs allege that the mishandling of their seized records led to the improper sharing of their confidential tax information with unauthorized individuals. *Id.* ¶ 66. First, Plaintiffs allege that in May 2016, the IRS informed Plaintiffs that their missing tax records were no longer in FBI or ICE custody, but rather "were maintained in a facility that could have been accessed by IRS personnel with the proper clearance if the taxpayer had provided permission." *Id.* ¶ 70. Plaintiffs believe that the referenced facility belongs to an undisclosed government agency ("Government Agency")[2] with whom Bancroft has or had a classified contractual relationship. *Id.* ¶ 71. Plaintiffs argue that this means that the FBI, ICE, and the U.S. Attorney's Office provided this third-party Government Agency with documents containing confidential tax return information "without authorization or any legitimate purpose." *Id.* ¶ 72.

Second, Plaintiffs allege that beginning on or around July 2012, IRS counsel Henn told Assistant U.S. Attorney Malis and Deputy Chief Bratt about: "the existence and status of the audit"; an IRS agent's "prediction that Bancroft's tax-exempt status would be revoked"; the agent's "view that Bancroft was not being cooperative"; and "specific information about Plaintiffs' accounts, transactions, and relationships with third parties." *Id.* ¶ 75. While Plaintiffs were informed in April 2013 that Ms. Henn had been in contact with the U.S. Attorney's Office, Plaintiffs were under the impression that this contact was for the limited purpose of finding out when the IRS would be able to gain access to the seized records. *Id.* ¶ 78. It was not until May 2016 that Plaintiffs learned that Ms. Henn had disclosed the information listed above to Mr. Malis and Mr. Bratt. *Id.*

---

[2] Bancroft explains that it does not identify either Government Agency or its parent agency in any of its filings because Bancroft's connections to these agencies are classified. *See* Pl.'s Opp'n at 23.

Third, Plaintiffs allege that the IRS impermissibly shared tax information, "including IRS-generated documents and Bancroft's own return information," with Government Agency. *Id.* ¶ 79. Plaintiffs also allege that in 2012, during a meeting at IRS headquarters, "IRS officials informed Government Agency employees that the IRS would revoke Bancroft's tax exempt status." *Id.* ¶ 81. Thereafter, Agent Hammett continued to speak with Government Agency's employees, including the then-Director of the Agency, about the audit at various points throughout 2012. *Id.* ¶ 82. Plaintiffs have also unearthed "a handwritten note, dated May 6, 2016 and signed by IRS official Nancy Todd, indicat[ing] that she had shared with a Government Agency employee . . . information prepared by the IRS exam in response to Bancroft's taxpayer protest." *Id.* ¶ 83. Overall, Plaintiffs allege that the IRS has discussed the following with Government Agency employees: "(i) Bancroft's accounting system and record-keeping; (ii) whether Bancroft properly had managed federal funds; (iii) whether Bancroft used Generally Accepted Accounting Principles; and (iv) whether the Government Agency would be willing to pressure Bancroft to relinquish its tax-exempt status." *Id.* ¶ 84.

Fourth, Plaintiffs allege that the IRS and the FBI disclosed Bancroft's tax return information to ICE, as evidenced by their conversation with Special Agent Dietrich on June 24, 2018. *See id.* ¶¶ 86–91. And fifth, Plaintiffs allege that the Government Agency improperly disclosed Bancroft's tax return information to employees of its parent agency ("Organization"), as evidenced by the fact that the Organization refused to consider Bancroft for a contract in January 2017 because "the Organization had been made aware of the IRS audit, that the IRS was going to shut down Bancroft, and that Bancroft's reputation involved a troublesome history of audits." *Id.* ¶ 96. Additionally, Bancroft alleges that employees of Government Agency disclosed this type of information to nine other individuals, such as "management-level staff in a

procurement entity, who were well-positioned to make decisions about Bancroft's eligibility to receive government contracts." *Id.* ¶¶ 98–99. Plaintiffs explain that they learned of these disclosures in May 2016, when they received Government Agency's list of third-party contacts as part of the audit. *Id.* ¶ 100.

Plaintiffs filed this suit in March 2017 alleging unlawful disclosure of their tax return information in violation of 26 U.S.C. § 6103. Compl. ¶¶ 13–14, ECF No. 1. Three weeks later, they filed an amended complaint, filling in some of the details of their unlawful disclosure claims and adding requests for a declaratory judgment for spoliation of property the government destroyed and for replevin of the documents seized. *See generally* Am. Compl, ECF No. 9. Defendant John Koskinen, then-Commissioner of the IRS, moved to dismiss many of the counts in the new complaint on several grounds, including (1) that Plaintiffs named the wrong defendants in their unlawful disclosure of their tax return information claims, (2) that some of the unlawful disclosure claims were time-barred, (3) that Plaintiffs provided insufficient details to state cognizable claims for the unlawful disclosure of their tax information, and (4) that the claim of spoliation against the Commissioner of the IRS in his official capacity should be dismissed because Plaintiffs had not alleged that the IRS had custody of the documents Plaintiffs sought. *See* Koskinen Mot. Dismiss at 2, ECF No. 23. The remaining defendants— ICE, the Department of Justice, and several of its sub-components—also moved to dismiss several counts of the amended complaint on the grounds that (1) the unlawful disclosure claims were insufficiently pleaded, and (2) that Plaintiffs' spoliation and replevin claims should have been brought under the Federal Tort Claims Act, but that even if they had been, Plaintiffs had failed to exhaust their administrative remedies in order to bring such claims. *See* Mem. Supp. DOJ Mot. Dismiss at 1– 2, ECF No. 24.

Upon review of the Government's motions, Plaintiffs moved to amend their complaint to (1) add the United States as a defendant to all of their claims, and (2) replace the replevin and spoliation claims with a claim under Federal Rule of Criminal Procedure 41(g) for the return of property. *See* Mot. Amend, ECF No. 29. The Court granted Plaintiffs' motion and Plaintiffs' Second Amended Complaint became the operative complaint in this case. *See* Mem. Op. (Oct. 27, 2017), ECF No. 35. The United States has now moved to dismiss Plaintiffs' five unlawful disclosure claims, and its motion is ripe for decision. *See* Defs.' Mot. Dismiss, ECF No. 42.

## III. LEGAL STANDARD

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994). "[T]he existence of consent is a prerequisite for jurisdiction," *United States v. Mitchell*, 463 U.S. 206, 212 (1983), and a "plaintiff must overcome the defense of sovereign immunity in order to establish the jurisdiction necessary to survive a Rule 12(b)(1) motion to dismiss." *Jackson v. Bush*, 448 F. Supp. 2d 198, 200 (D.D.C. 2006). "[L]imitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied." *Lehman v. Nakshian*, 453 U.S. 156, 160–61 (1981). A court, however, must accept "the allegations of the complaint as true," *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015), and "construe the complaint 'liberally,' granting plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (quoting *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Where necessary to resolve a jurisdictional challenge, "the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus

the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

Overall, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (citing 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success on the merits; rather, it tests whether a plaintiff has properly stated a claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor. *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000). Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555–56 (citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a Rule 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678. A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations, *see Twombly*, 550 U.S. at 555.

# IV. ANALYSIS

The Government has moved to dismiss Counts III, IV, V, VI, and VII of Plaintiffs' Second Amended Complaint on several grounds. First, the Government argues that Plaintiffs have not shown that they filed suit within the applicable limitations period for Counts IV, V, VII. Defs.' Mot. at 6–10. This failure to demonstrate timeliness, the Government argues, deprives the Court of subject matter jurisdiction over these counts. Second, the Government argues that Plaintiffs have failed to state viable claims for violations of § 6103 in all of their unlawful disclosure counts. *See id.* at 10. Plaintiffs respond that all of their claims are timely and sufficiently pleaded. *See generally* Pls.' Opp'n, ECF No. 44. As explained below, the Court finds that Counts III and VII were insufficiently pleaded and therefore dismisses those claims. Additionally, the Court finds that Mr. and Mrs. Stock lack standing to bring Count VI and a portion of Count IV and therefore dismisses their claims in those counts as well.

## A. The Statute of Limitations

The Government contends that several of Plaintiffs' unlawful disclosure claims were untimely filed, and that because § 7431's statute of limitations is jurisdictional, the Court does not have subject matter jurisdiction over the untimely claims. *See* Defs.' Mot. at 6–10. To support their argument that § 7431's statute of limitations is jurisdictional, the Government points to *Aloe Vera of Am. v. United States* ("*Aloe Vera I*"), 580 F.3d 867 (9th Cir. 2009) and *Gandy v. United States*, 234 F.3d 281 (5th Cir. 2000), cases in which courts found § 7431's statute of limitations to be jurisdictional. In the alternative, the Government argues that the allegedly untimely counts may be dismissed for failure to state a claim because Plaintiffs' "pleadings show that they knew or had reason to know of the disclosures more than two years before filing suit." Defs.' Mot. at 7. Plaintiffs respond that, Ninth and Fifth Circuit opinions

notwithstanding, "a decade of Supreme Court and D.C. Circuit precedent . . . mak[es] clear that a limitations period like the one contained in Section 7431(d) is a non-jurisdictional affirmative defense on which the Government bears the burden at all times." Pls.' Opp'n at 9. And regardless, Plaintiffs argue, their Second Amended Complaint makes clear that Plaintiffs discovered each alleged offense within the limitations period. *Id.* at 12. As explained below, the Court finds that § 7431's statute of limitations is not jurisdictional, but rather is an affirmative defense. Therefore, viewing the facts alleged in the Second Amended Complaint in the light most favorable to Plaintiffs, the Court finds that it cannot at this point in the proceedings determine whether Counts IV, V, and VII are time-barred, and therefore denies the Government's motion to dismiss on this ground.

### 1. The Nature of § 7431's Statute of Limitations

Section 7431 provides, in a subsection called "Period for bringing action," that "[n]otwithstanding any other provision of law, an action to enforce any liability created under this section may be brought, without regard to the amount in controversy, at any time within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure." 26 U.S.C. 7431(d). This limitations period applies both to suits against the United States when employees of the United States violate § 6103, *see id.* § 7431(a)(1), and suits against non-employees when they violate § 6103, *see id.* § 7431(a)(2).

When the United States is named as a defendant in a suit, a cause of action's statute of limitations generally falls into two major categories. First, there are statutes of limitations that "seek primarily to protect defendants against stale or unduly delayed claims." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133 (2008). These statutes of limitations are non-jurisdictional and are therefore subject to forfeiture, waiver, and equitable tolling. *Id.* Second,

there are statutes of limitations that "seek not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as . . . limiting the scope of a governmental waiver of sovereign immunity." *Id.* (citations and internal quotation marks omitted).

The question of which category a statute of limitations falls into "is not merely semantic but one of considerable practical importance for judges and litigants. Branding a rule as going to a court's subject-matter jurisdiction alters the normal operation of our adversarial system." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). For example, in overcoming a motion to dismiss, into which of the two categories a statute of limitations falls can be critical. When defending against a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, plaintiffs bear the burden of pleading and eventually proving a court's subject matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). If a plaintiff cannot establish that his claims "lie within 'the Judicial Power of the United States,'" *Maxberry v. Dep't of the Army*, 952 F. Supp. 2d 48, 50 (D.D.C. 2013) (quoting U.S. Const. art. III, § 1), and that "a federal statute grants the court jurisdiction to hear those claims," *id.* (citing *Abdelfattah v. U.S. Dep't of Homeland Sec.*, 893 F. Supp. 2d 75, 78 (D.D.C. 2012)), the court must dismiss the claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citing *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

On the other hand, when a statute of limitations is non-jurisdictional, and is therefore an affirmative defense, a court should grant a motion to dismiss "only if the complaint on its face is conclusively time-barred." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996); *see also Bregman v. Perles*, 747 F.3d 873, 875 (D.C. Cir. 2014) ("Because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its

face is conclusively time-barred."). Overall, "although not without exception, the plaintiff typically bears the burden of proving that the Court has jurisdiction over the matter, . . . while the defendant bears the burden of proof on most affirmative defenses." *McGary v. Hessler-Radelet*, 156 F. Supp. 3d 28, 33 (D.D.C. 2016) (internal citations omitted).

Neither the Supreme Court nor the D.C. Circuit has clarified under which umbrella the statute of limitations in § 7431 stands. Indeed, only two Circuits have addressed this issue at all. The Fifth Circuit has provided little explanation for why it believed § 7431's statute of limitations to be jurisdictional. *See Gandy*, 234 F.3d at 283 ("If a waiver of sovereign immunity contains a limitations period, a plaintiff's failure to timely file suit deprives the court of jurisdiction." (citing *United States v. Dalm*, 494 U.S. 596, 608, (1990)). However, the Ninth Circuit has provided a thorough analysis, explaining that § 7431's statute of limitations is jurisdictional because (1) "the structure of section 7431 indicates that Congress intended the limitation period to restrict the scope of the government's waiver of sovereign immunity," and (2) "the language of section 7431(d) shows that Congress intended the statute of limitations to be absolute." *Aloe Vera I*, 580 F.3d at 871. In particular, the Ninth Circuit found that because § 7431's waiver of sovereign immunity, 26 U.S.C. § 7431(a) (providing that "in general," a "taxpayer may bring a civil action for damages against the United States in a district court of the United States" for a disclosure in violation of § 6103), was housed within the same section as the statute of limitations for bringing such a suit, *id.* § 7431(d), filing within the limitations period was a requirement for the court to gain jurisdiction over the case by waiver of sovereign immunity. *See Aloe Vera I*, 580 F.3d at 871. The Court also found that the inclusion of the phrase "[n]otwithstanding any other provision of law" demonstrated that Congress intended for "[n]o

provision of law [to] abrogate that prescription, including any provision that may provide for equitable tolling or waiver." *Id.* at 871–72.

Since *Aloe Vera I* and *Gandy* were decided, the Supreme Court has further clarified how courts should determine whether compliance with a statute of limitations is required for jurisdictional purposes or merely required to properly state a claim. For example, in *United States v. Kwai Fun Wong*, 135 S. Ct. 1625 (2015), the Court emphasized that "'the same rebuttable presumption of equitable tolling' should also apply to suits brought against the United States under a statute waiving sovereign immunity," *id.* at 1631 (*quoting Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96 (1990)), and that in order to overcome that rebuttable presumption, "the Government must clear a high bar to establish that a statute of limitations is jurisdictional," *id.* at 1632, by demonstrating that Congress "clearly stated" that it intended the limitations period to be jurisdictional, *id.* (quoting *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 153 (2013)). In clearly stating that the limitations period is meant to be jurisdictional, "Congress must do something special, beyond setting an exception-free deadline." *Id.* In order to find that "something special," courts must look to "the text, context, and relevant historical treatment of the provision at issue." *Musacchio v. United States*, 136 S. Ct. 709, 717 (2016) (internal citation and quotation marks omitted).

The question of how § 7431(d) has been historically treated can be easily answered. While the Ninth and Fifth Circuits have found the limitations period to be jurisdictional, the D.C. Circuit and Supreme Court have never addressed the issue. Therefore, this case is easily distinguishable from *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 138–39 (2008) (declining to overturn prior cases holding that 28 U.S.C. § 2501 is jurisdictional, despite *Irwin*'s holding that "limitations principles should generally apply to the Government in the same way

that they apply to private parties," because "Congress has long acquiesced in the interpretation we have given"), and *Bowles v. Russell*, 551 U.S. 205, 210–13, (2007) ("Although several of our recent decisions have undertaken to clarify the distinction between claims-processing rules and jurisdictional rules, none of them calls into question our longstanding treatment of statutory time limits for taking an appeal as jurisdictional."). *Cf. Menominee Indian Tribe of Wis. v. United States*, 614 F.3d 519, 525 (D.C. Cir. 2010) ("Section 605(a) lacks a comparable lineage."). Additionally, the parties have presented no legislative history to demonstrate that Congress intended this statute of limitations to serve one purpose or another. *See Kwai Fun Wong*, 135 S. Ct. at 1633 ("[E]ven assuming legislative history alone could provide a clear statement (which we doubt), none does so here.")

Turning next to the language of § 7431(d), the Court finds that the text at issue is not so strong as to "clearly state" that the statute of limitations is jurisdictional. In *Aloe Vera I*, the court was persuaded that "[t]he inclusion of the phrase '[n]otwithstanding any other provision of law' at the beginning of the subsection require[d] that an action may be brought only within the two-year period," and that "[b]y including this phrase, Congress clearly signaled that the statute of limitations is absolute," i.e., jurisdictional. *See Aloe Vera I*, 580 F.3d at 871–72. However, in *Kwai Fun Wong*, the Court noted that statutes of limitations may be non-jurisdictional "even when the time limit is important (most are) and even when it is framed in mandatory terms (again, most are); indeed, that is so 'however emphatic[ally]' expressed those terms may be." *Kwai Fun Wong*, 135 S. Ct. at 1632 (alteration in original) (quoting *Henderson v. Shinseki*, 562 U.S. 428, 439 (2011)). The statutory provision being analyzed in *Kwai Fun Wong*, the FTCA's statute of limitations, used similarly forceful terms: "'[a] tort claim against the United States shall be *forever barred* unless it is presented [to the agency] within two years . . . or unless action

is begun within six months' of the agency's denial of the claim." *Kwai Fun Wong*, 135 S. Ct. at

1632 (emphasis added) (quoting 28 U.S.C. § 2401(b)). However, the Court found the FTCA's

limitations period to be nonjurisdictional because § 2401(b) "does not speak in jurisdictional

terms or refer in any way to the jurisdiction of the district courts," *id.* at 1633 (citing *Arbaugh v.*

*Y & H. Corp.*, 546 U.S. 500, 515 (2006)), "does not define a federal court's jurisdiction over tort

claims generally, [and does not] address its authority to hear untimely suits, or in any way cabin

its usual equitable powers." *Id.*

Caselaw within this Circuit regarding the phrase "notwithstanding any other provision of

law" provides scant guidance on how the phrase should be interpreted in this context. While "[a]

clearer statement is difficult to imagine," *Liberty Mar. Corp. v. United States*, 928 F.2d 413, 416

(D.C. Cir.1991) (internal citation and quotation marks omitted), the only Circuit case analyzing

this phrase as it modifies a statute of limitations is *King v. Dole*, 782 F.2d 274 (D.C. Cir. 1986),

in which the court found that "[b]y providing that '[n]otwithstanding any other provision of law,

any such case filed . . . must be filed within 30 days after the date the individual filing the case

received notice of the judicially reviewable action,' 5 U.S.C. § 7703(b)(2), Congress left no

doubt as to the mandatory nature of the time limit." *Id.* at 276. While *King* is still precedential in

this Circuit, *see Brookens v. Acosta*, 297 F. Supp. 3d 40, 47 (D.D.C. 2018), many other courts

have found that, in light of *Irwin*, § 7703(b)(2) is subject to equitable tolling, and therefore, that

the statute of limitations is not jurisdictional. *See Nunnally v. MacCausland*, 996 F.2d 1, 4 (1st

Cir. 1993) (listing cases reaching that conclusion). Moreover, § 7703(b)(2) contains a mandatory

"must," while § 7431(d) contains a less stringent "may." For these reasons, the Court concludes

that it cannot determine from the language of § 7431(d) that Congress intended the timing

provision to be a limitation on this Court's jurisdiction.

Finally, the structure of § 7431 fails to provide that "something special" as well. *Musacchio*, 136 S. Ct. at 717. In *Kwai Fun Wong*, the Court took note of the fact that the FTCA's statute of limitations was housed in a different portion of the U.S. Code than its waiver of sovereign immunity. *Kwai Fun Wong*, 135 S. Ct. at 1633 (comparing locations of 28 U.S.C. § 1346(b)(1) and 28 U.S.C. § 2401(b)). Noting that the "Court has often explained that Congress's separation of a filing deadline from a jurisdictional grant indicates that the time bar is not jurisdictional," *id.* (internal citations omitted), the Court explained that "[t]reating § 2401(b)'s time bars as jurisdictional would thus disregard the structural divide built into the statute." *Id.*

Here, the applicable statute of limitations is housed within the same section as the Government's waiver of sovereign immunity. *See* 26 U.S.C. § 7431(a)(1), (d). However, although the Ninth Circuit found this significant in *Aloe Vera I*, "[m]ere proximity will not turn a rule that speaks in nonjurisdictional terms into a jurisdictional hurdle." *Gonzalez v. Thaler*, 565 U.S. 134, 146–48 (2012) (discussing appellate jurisdiction over § 2255 habeas petition decisions); *see also Owens v. Republic of Sudan*, 864 F.3d 751, 803 (D.C. Cir. 2017) ("If proximity alone were enough, then every subsection in a section containing a jurisdictional provision would, by the transitive property, also abut a jurisdictional subsection and therefore be jurisdictional as well, an absurd proposition."). Instead, the Court must analyze the statute as a whole. In *Gonzalez*, the Supreme Court took note of the fact that other provisions within that section spoke in "clear jurisdictional terms," indicating that if Congress intended the subsection at issue to be jurisdictional, it would have said so. *Id.* at 147. Presumably, if Congress intended § 7431 to be jurisdictional, it would have said so as well.

The Court also takes note of the fact that § 7431 applies to two separate causes of action: one against the United States and one against private individuals. "Time requirements in lawsuits

between private litigants are customarily subject to equitable tolling." *Irwin*, 498 U.S. at 95 (internal citation and quotation marks omitted). As such, statutes of limitations in suits between private parties are not ordinarily jurisdictional. And there is no indication from the language in § 7431 that Congress intended to depart from this default principle, nor is there any indication from the language in the statute that Congress intended for the same statute of limitations, § 7431(d), to operate differently as to the two causes of action contained in § 7431(a). Accordingly, the Court concludes that § 7431's statute of limitations is a nonjurisdictional affirmative defense and that the Court must analyze Plaintiffs' pleadings as to timing under the Rule 12(b)(6) standard, as opposed to the Rule 12(b)(1) standard.

## 2. The Timeliness of Counts IV, V, and VII

The reason Plaintiffs and the Government so fervently contest the nature of § 7431's statute of limitations is clear from the face of Plaintiffs' Second Amended Complaint: § 7431 provides for a statute of limitations within two years of the "discovery" of an unauthorized disclosure, and the clarity with which Plaintiffs allege the dates that they discovered the disclosures of their tax return information varies by count. For example, with regard to the IRS's disclosure of tax information to the Department of Justice (Count IV) and Government Agency's disclosure of tax information to its parent agency and at least nine federal employees (Count VII), Plaintiffs explicitly recount that they did not learn about the unauthorized disclosures until May 2016. *See* 2d Am. Compl. ¶¶ 78, 100. Conversely, when recounting the facts underlying Plaintiffs' claim for the unauthorized disclosure of tax information to Government Agency by the IRS (Count V), Plaintiffs include no mention of when Plaintiffs discovered that any of these disclosures were made. *See id.* ¶¶ 79–84.

Both parties ask the Court to characterize the pleadings otherwise. The Government argues that "[t]he purported disclosures discussed in Counts IV, V, and VII occurred as early as 2011, and Plaintiffs knew of communications between various agencies regarding their seized tax documents and audits no later than April of 2013," which the Government believes demonstrates that Plaintiffs knew, or should have known, about the alleged disclosures long before May 2016. Defs.' Mot. at 7 (citing ECF No. 18 at 9 (e-mail from IRS Revenue Officer Hammett to Plaintiffs' counsel Craig Peters regarding IRS contacts with U.S. Attorney's Office)). Relying on the Ninth Circuit's holding in *Aloe Vera II* that the § 7431 statute of limitations begins to run when Plaintiffs "knew or reasonably should have known of the government's allegedly unauthorized disclosures," Defs.' Mot. at 8 (quoting *Aloe Vera II*, 699 F.3d at 1160), the Government argues that Plaintiffs were put on inquiry notice of the unauthorized disclosures when they were made aware by April 2013 that the IRS was working with the Department of Justice to obtain some of the records the Government had seized in 2011. *Id.* at 7–8. Plaintiffs, on the other hand, argue that their complaint clearly states that they discovered each of these disclosures in the middle of 2016. *See* Pls.' Opp'n at 12–15. While this is not correct—Plaintiffs' complaint does not in fact explicitly mention when Plaintiffs discovered the disclosures complained of in Count V—because the statute of limitations at issue here is an affirmative defense, and because the facts alleged as to each count are consistent with Plaintiffs discovering each disclosure in 2016, the Court denies the Government's motion to dismiss on this ground.

### a. Counts IV and VII

In Count IV, Plaintiffs allege that they did not learn of the "true extent" Ms. Henn's unauthorized disclosures to two DOJ attorneys until May of 2016. 2d Am. Compl. ¶ 78. The

Government argues that Plaintiffs should have known of the disclosures by at least April 2013 because by then "Plaintiffs knew of communications between various agencies regarding their seized tax documents and audits." Defs.' Mot. at 7. However, the Government does not explain how Plaintiffs being made aware of the fact that the IRS was working with the Department of Justice to obtain the records it needed to compete its audits of Plaintiffs would have made Plaintiffs aware of the fact that Ms. Henn had told Mr. Malis and Mr. Bratt that the IRS predicted that Bancroft was about to lose its tax-exempt status, that Bancroft was not cooperating with the audit, or other "specific information about Plaintiffs' accounts, transactions, and relationships with third parties." 2d Am. Compl. ¶ 75; *see* Defs.' Mot. at 7–8.

Dismissal based on a statute of limitations is improper "as long as a plaintiff's potential rejoinder to the affirmative defense [is not] foreclosed by the allegations in the complaint." *de Csepel v. Republic of Hungary*, 714 F.3d 591, 608 (D.C. Cir. 2013) (alteration in original) (internal quotation marks and citation omitted). "Because statute of limitations issues often depend on contested questions of fact, . . . the court should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint." *Adams v. District of Columbia*, 740 F. Supp. 2d 173, 180 (D.D.C. 2010), *aff'd*, 618 F. App'x 1 (D.C. Cir. 2015). On the other hand, if "no reasonable person could disagree on the date" on which the cause of action accrued, the court may dismiss a claim on statute of limitations grounds. *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998) (citing *Kuwait Airways Corp. v. Am. Sec. Bank, N.A.*, 890 F.2d 456, 463 n. 11 (D.C. Cir. 1989)). Because the parties dispute when Plaintiffs first learned of these disclosures, and because Plaintiffs' complaint plausibly states that Plaintiffs first learned of these disclosures in May 2016, the Court cannot

determine at this stage in the proceedings whether Plaintiffs' claim is time-barred, and therefore will not dismiss Count IV on this basis.

Similarly, the Government points to no factual allegation that would have given Plaintiffs a reason to inquire as to whether employees of Government Agency had informed employees of its parent agency "that the IRS was going to shut down Bancroft[] and that Bancroft's reputation involved a troublesome history of audits" before January 2017. 2d Am. Compl. ¶ 96. While the facts used to support Count VII are not a model in clarity – for example, Plaintiffs allege that Government Agency "admitted in a statement provided to the IRS that Government Agency employees discussed Bancroft's tax return information with nine individuals," some of whom do not work in Government Agency, but they do not allege what types of information was shared, *id.* ¶ 98—there is nothing within Plaintiffs' complaint that would suggest that Plaintiffs should have suspected this sort of information sharing prior to March 3, 2015 (two years before Plaintiffs filed this suit). As such, Count VII will not be dismissed as time-barred either.

### b. Count V

Conversely, the facts recounted to support Court V lack any indication of when Plaintiffs might have first learned that between 2012 and 2016, "the IRS also shared with the Government Agency most, if not all, audit activity of Bancroft, including IRS-generated documents and Bancroft's own return information," *id.* ¶ 79, or that "IRS officials [had] informed Government Agency employees that the IRS would revoke Bancroft's tax exempt status," *id.* ¶ 81. Plaintiffs claim that their complaint's mention of "a handwritten note, dated May 6, 2016 and signed by IRS official Nancy Todd, indicat[ing] that she had shared with a Government Agency employee [] information prepared by the IRS exam in response to Bancroft's taxpayer protest," demonstrates when they first learned of these disclosures. *Id.* ¶ 83. However, the complaint does

not explain whether the receipt of this note, whenever Plaintiffs first reviewed it after May 6, 2016, constituted the first time that they were alerted to the fact that the IRS may have been sharing their confidential tax information with Government Agency. If the statute of limitations at issue here were jurisdictional, Plaintiffs would likely have failed to meet their burden of pleading that their claim was timely. However, because Plaintiffs' complaint leaves open the very real possibility that Plaintiffs first learned of these disclosures after March 3, 2015, and would have had no reason to know about them ahead of time, "the complaint on its face is [not] conclusively time-barred." *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Therefore, the Court does not dismiss Count V on this ground either.

### B. The Sufficiency of the Pleadings in Counts III, IV, V, VI, and VII

The Government also argues that Plaintiffs have failed to plead sufficient facts to state claims of unlawful disclosure in violation of § 6103. In particular, the Government argues that Plaintiffs' unlawful disclosure claims are not supported by the necessary allegations of the date of the disclosures, who made them, to whom they were made, the nature of the disclosure, and the circumstances surrounding them, as well as allegations demonstrating that the disclosures came directly or indirectly from the IRS and do not fall within one of § 6103's many exceptions, and are therefore insufficiently pleaded. *See* Defs.' Mot. at 10–11. Plaintiffs respond that the Government is attempting to impose on Plaintiffs a more stringent pleading standard than is actually required by law, and that Plaintiffs have indeed pleaded sufficient facts to state valid claims under § 7431. *See* Pls.' Opp'n at 15–24. For the reasons explained below, the Court will dismiss Counts III and VII, but not Counts IV, V, and VI, as insufficiently pleaded.

### 1. Information Obtained from Non-IRS Sources

The Government's first challenge to the sufficiency of Plaintiffs' pleadings is that some of their claims are for the disclosure of "documents or information acquired independently from a taxpayer or party other than the IRS." Defs.' Mot. at 12. Citing to *Stokwitz v. United States*, 831 F.2d 893 (9th Cir. 1987), *Lamont v. O'Neill*, 285 F.3d 9 (D.C. Cir. 2002), and *Ryan v. United States*, 74 F.3d 1161 (11th Cir. 1996), the Government argues that Count III of the Second Amended Complaint, which seeks to recover for the FBI and the U.S. Attorney's Offices disclosure of Plaintiffs' confidential returns and return information to employees of Government Agency, does not in fact allege a violation of § 6103 because none of the documents shared came directly or indirectly from the IRS. Defs.' Mot. at 12–13. Plaintiffs respond that § 6103's broad language, which provides that "no officer or employee of the United States . . . shall disclose any return or return information obtained by him in any manner," includes the disclosure of confidential material obtained by a non-IRS federal employee during the execution of a search warrant. Pls.' Opp'n at 16. The Court agrees that the United States may be held liable when non-IRS federal employees disclose confidential returns or return information. However, because the documents shared came from Plaintiffs themselves, Count III is not one of those instances.

Section 7431(a)(1) allows taxpayers to bring civil actions for damages against the United States "[i]f any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103," 26 U.S.C. § 7431(a)(1). Section 6103 defines the phrase "return" as "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title *which is filed with the Secretary* by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including

supporting schedules, attachments, or lists which are supplemental to, or part of, the return so

filed." 26 U.S.C. § 6103(b)(1) (emphasis added). It further defines "return information" as,

among other things,

> a taxpayer's identity, the nature, source, or amount of his income,
> payments, receipts, deductions, exemptions, credits, assets,
> liabilities, net worth, tax liability, tax withheld, deficiencies,
> overassessments, or tax payments, whether the taxpayer's return
> was, is being, or will be examined or subject to other investigation
> or processing, or any other data, *received by, recorded by, prepared
> by, furnished to, or collected by the Secretary* with respect to a return
> or with respect to the determination of the existence, or possible
> existence, of liability (or the amount thereof) of any person under
> this title for any tax, penalty, interest, fine, forfeiture, or other
> imposition, or offense . . . .

*Id.* § 6103(b)(2) (emphasis added). Therefore, while § 6103 does not specify that only IRS

employees must work to keep returns and return information confidential, the statute does

specify that it protects documents and information "filed with the Secretary" or "received by,

recorded by, prepared by, furnished to, or collected by the Secretary." *Id.* § 6103(b)(1), (2).

The Government emphasizes that there is wide agreement that information obtained

directly from a taxpayer, as opposed to the IRS, does not fall within the definitions of "return" or

"return information" in the Act. *See, e.g.*, *Lomont v. O'Neill*, 285 F.3d 9, 15 (D.C. Cir. 2002)

("An element of return information is that it be received by, recorded by, prepared by, furnished

to, or collected by the Secretary . . . . Yet here state and local officers obtain the information

from the [taxpayer] before the return is filed with the Secretary." (internal citations and quotation

marks omitted)); *Ryan v. United States*, 74 F.3d 1161, 1163 (11th Cir. 1996) ("[T]he statutory

definition of "return information" confines it to information that has passed through the IRS.");

*Stokwitz v. United States*, 831 F.2d 893, 894 (9th Cir. 1987) ("The district court concluded that

section 6103, and hence section 7431, were directed 'at those government officers and

employees who obtained returns and return information as a result of these materials being filed by or on behalf of the taxpayer, or received by, furnished to, or collected by the Secretary.' We agree."). This Court agrees as well. While § 6103 applies not only to IRS employees, but rather to "all who receive information from the IRS, directly or indirectly," returns and return information must have, in some way, passed through the IRS in order to be protected under § 6103. *Stokwitz*, 831 F.2d at 896 n.4.

In their factual allegations supporting Court III, Plaintiffs explain that in May 2016, they were informed by the IRS that some of their tax records, which the FBI and ICE had seized directly from Plaintiffs' home and office, were being "maintained in a facility that could have been accessed by IRS personnel with the proper clearance if the taxpayer had provided permission." 2d Am. Compl. ¶ 70, *see also id.* ¶¶ 66–68. Plaintiffs believe that the facility to which the IRS referred belongs to Government Agency, with which Bancroft has or had a classified contractual relationship. *Id.* ¶ 71. Plaintiffs argue that this was an unauthorized disclosure of their tax returns and tax return information in violation of § 6103. However, because the referenced copies of these tax and financial documents were obtained directly from Plaintiffs, and because these copies themselves did not pass through the IRS before landing in the FBI and U.S. Attorney's Offices' possession, they are not "returns" or "return information" under § 6103 and § 7431. Therefore, Count III fails to state a claim for the unlawful disclosure of tax return or return information, and must be dismissed.

The Government next moves to dismiss Counts VI and VII on the ground that the recipients of the disclosed information might have learned of the information disclosed from the plaintiffs themselves or their attorneys, and that therefore, the information was both not disclosed by a federal employee and also did not constitute "returns" or "return information" under the

statute. *See* Defs.' Mot. at 13 (explaining that "Section 6103 defines 'disclosure' as the 'making known to any person in any manner whatever a return or return information.'" (quoting 26 U.S.C. § 6103(b)(8))). In support of Count VI, Plaintiffs respond that their Second Amended Complaint alleges that ICE Special Agent Dietrich learned of Plaintiffs' confidential return information directly from IRS or FBI employees. *See* Pl.'s Opp'n at 22 (citing 2d Am. Compl. ¶ 91). Additionally, they point out that even if Special Agent Dietrich had learned of the audit's existence directly from Plaintiffs or their attorneys, that fact would not be enough to dismiss Count VI for failure to state a claim. *See id.* (citing *Mallas v. United States*, 993 F.2d 1111, 1121 (4th Cir. 1993) ("[E]ven to the extent that the [revenue agent reports] repeated information otherwise available to the public, they still fell within" the protection of § 6103.)). In support of Count VII, Plaintiffs respond again that their complaint alleges that Government Agency obtained the information it shared with its parent agency and the nine undisclosed federal employees directly from the IRS. *See* Pl.'s Opp'n at 23 n.14. The Court finds that the Second Amended Complaint contains sufficient factual allegations that the information disclosed to Special Agent Dietrich, the parent agency, and nine other federal employees constitutes tax "return information" under the statute.

In constructing their claim in Count VI, Plaintiffs allege that when Special Agent Dietrich dropped off two boxes of previously seized material, he made clear that he was aware that the IRS was still auditing Plaintiffs, and according to Plaintiffs, was aware of the "anticipated outcome" of the audit. 2d Am. Compl. ¶¶ 87, 89. Plaintiffs explain that "ICE agents should never have been made aware of the existence of an IRS audit in the first place, much less that it was still unresolved three-and-a-half years after it began." *Id.* ¶ 90. Plaintiffs believe that the IRS and the FBI informed ICE of this information. *Id.* ¶ 91.

These allegations make clear that Plaintiffs do not believe they ever informed any ICE personnel of the fact that they were being audited or that Plaintiffs believed that some of the records ICE and the FBI had seized might be relevant to the audit. "It is essential to remember that, for the purposes of ruling on a motion to dismiss, the factual allegations of the complaint *must* be presumed to be true and liberally construed in favor of the Plaintiff." *Paulin v. George Washington Univ. Sch. of Med. & Health Scis.*, 878 F. Supp. 2d 241, 246 (D.D.C. 2012) (emphasis in original). The Government cites to several emails in which Plaintiffs' counsel corresponded with individuals in the Department of Justice about Plaintiffs' need to regain possession of their property in order to comply with the IRS's document requests. *See* Defs.' Mot. at 13. However, disclosure of the existence of an audit to the Department of Justice for the purpose of retrieving files does not indicate similar disclosures to another, entirely separate agency. And what is more, even if Plaintiffs had informed ICE that it was under audit in its attempt to regain possession of its property, that would not explain how Special Agent Dietrich also knew about the likely outcome of the IRS's audit. Therefore, the Court cannot dismiss Count VI on the ground that it is possible that ICE received some of Plaintiffs' confidential tax information from Plaintiffs themselves.

Similarly, Plaintiffs' complaint does not indicate in any way that Plaintiffs may have disclosed to Government Agency the tax information that Government Agency allegedly disclosed to employees of Government Agency's parent agency and nine other unnamed federal employees. *See generally* 2d Am. Compl. ¶¶ 92–102. Indeed, it seems implausible that Plaintiffs had any incentive to tell anyone working at Government Agency that "the IRS was going to shut down Bancroft, and that Bancroft's reputation involved a troublesome history of audits." *Id.* ¶ 96. As such, the Court cannot dismiss Count VII on this ground either.

## 2. The Detail Required to State a Claim

The Government further argues that, as to Counts IV, VI, and VII, Plaintiffs have not given the Government enough facts regarding the circumstances of these allegedly unlawful disclosures to properly state a claim under § 7431 or to allow the Government to properly defend itself. *See* Defs.' Mot. at 14–16. Plaintiffs counter that the Government is attempting to impose on Plaintiffs a heightened pleading standard, more akin to Rule 9(b)'s pleading standard, without any legal support to buttress their entitlement to more details at this stage in the proceedings. *See* Pls.' Opp'n at 15. As explained below, the Court finds that Plaintiffs have included enough facts in support of Counts IV and VI to properly state claims under § 7431. However, the Court finds that Count VII is insufficiently pleaded, and therefore dismisses that claim.

Complaints for the unlawful disclosure of tax information are not subject to the heightened pleading standard of Rule 9. *See, e.g.*, *NorCal Tea Party Patriots v. IRS*, No. 13-cv-341, 2014 WL 3547369, at *14 (W.D. Ohio. July 17, 2014) ("Plaintiff did not need to plead detailed facts and its allegations are sufficient to meet the Rule 8(a) standard."); *Fostvedt v. United States*, 824 F. Supp. 978, 985 (D. Colo. 1993) (holding plaintiff's complaint to the Rule 8(a) pleading standard). However, district courts generally tend to hold that in a "wrongful disclosure action, plaintiff must specifically allege who made the alleged disclosures, to whom they were made, the nature of the disclosures, the circumstances surrounding them, and the dates on which they were made." *May v. United States*, No. 91-0650-CV-W-9, 1992 U.S. Dist. LEXIS 16055, at *6 (W.D. Mo. Apr. 17, 1992) (citing five district court decisions noting the same); *see also Dean v. United States*, No. 09-3095, 2010 WL 1257792, at *4 (D.N.J. Mar. 29, 2010) ("The plaintiff, in making this allegation, properly alleges who made the disclosures, to whom they were made, and the dates of and circumstances surrounding the disclosure."). A plaintiff must

also plead "what specific 'return or return information' an employee of the United States disclosed that violated § 6103." *May*, 1992 U.S. Dist. LEXIS 16055 at *6–*7.

This level of detail is required to put the Government on notice of which exact actions a plaintiff challenges. "By having the alleged illegally disclosed information properly pleaded, the Defendant is able to identify which exception, if any, the disclosure will fall into under § 6103. Absent a proper identification of the alleged illegally disclosed information, there would be a constant guessing game as to the disclosures and exceptions." *Id.* at *7. This standard applies even when a plaintiff would be able to allege more detailed factual allegations after discovery. *See Fostvedt*, 824 F. Supp. at 986 (Despite the fact that discovery might allow the plaintiff to better plead his claim for unlawful disclosure, "[b]ased on [the plaintiff's] conclusory, nebulous claim, the United States can have no way of knowing what discovery it should produce" and will therefore be "unable to formulate a defense.").

The Government first argues that Plaintiffs' pleadings in support of Count IV are insufficient because pleadings merely alleging that the disclosures took place over the course of a year gives the Government insufficient notice of the claim. *See* Defs.' Mot. at 14. However, the Court finds this rough timeline sufficient to put the Government on notice of which disclosures Plaintiffs are challenging. *See May*, 1992 U.S. Dist. LEXIS 16055, at *7. While more detail would always be helpful, the Government will not need specific dates to rebut claims based on these particular conversations when so many other details have also been pleaded. Because the Government's ability to defend itself will not be hampered by this prolonged timeline, the Court will not dismiss Count IV on this basis. *See Fostvedt*, 824 F. Supp. at 986. Additionally, the Court will not dismiss Count IV because there is a chance that Mr. Malis and Mr. Bratt learned of the IRS audit from Plaintiffs themselves. *See* Section IV.B.1; *see also Mallas v. United States*,

993 F.2d 1111, 1121 (4th Cir. 1993) ("[E]ven to the extent that the [revenue agent reports] repeated information otherwise available to the public, they still fell within" the protection of § 6103.)

Turning next to Count VI, the Government argues that "one ambiguous comment by an agent of ICE is insufficient to support a claim of unlawful disclosure." Defs.' Mot. at 15. In their complaint, Plaintiffs allege that the IRS and FBI must have disclosed the confidential tax return information to ICE Special Agent Dietrich at some point before June 24, 2015, as evidenced by the fact that Special Agent Dietrich was "aware[] of the existence, status, scope, and anticipated outcome of the IRS audit" when he dropped off two boxes of Plaintiffs' seized documents. 2d Am. Compl. ¶¶ 86, 89. While Plaintiffs have pleaded to whom their confidential tax information was disclosed (Special Agent Dietrich) and what was disclosed (the existence and status of the audit and its likely result), they have offered the Government little clue as to who they believe made these disclosures. Plaintiffs merely allege that "[u]pon further information and believe, this confidential information was disclosed to ICE officials by IRS and FBI employees." 2d Am. Compl. ¶ 91.

Alleging facts "upon information and belief" can be sufficient to survive a motion to dismiss. *See Evangelou v. District of Columbia*, 901 F. Supp. 2d 159, 170 (D.D.C. 2012) (A plaintiff may plead facts upon information and belief "where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible."). However, many courts have held that in order to state a claim for wrongful disclosure in violation of § 6103, plaintiffs need to identify, even if only upon information and belief, who made the unlawful disclosure and when. *See, e.g.*, *May*, 1992 U.S. Dist. LEXIS 16055, at *6 ("plaintiff must specifically allege who made the alleged

disclosures, to whom they were made, the nature of the disclosures, the circumstances surrounding them, and the dates on which they were made"); *see also Taylor v. Pekerol*, No. 14-cv-96, 2016 WL 5172829 (N.D. Fl. Aug. 12, 2016) (Report and Recommendation, *adopted in* 2016 WL 4618895, at *2 (N.D. Fl. Sept. 6, 2016)) (successful pleadings include the names of the individuals who received the wrongfully disclosed information); *Fedele v. Harris*, 69 F. Supp. 3d 313, 321–22 (N.D.N.Y. 2014) (same); *NorCal Tea Party Patriots v. I.R.S.*, No. 13-cv-341, 2014 WL 3547369, *13–14 (W.D. Ohio. July 17, 2014) (same). Here, Plaintiffs have not specifically alleged who made the disclosure, or when.

Not all courts hold plaintiffs to such stringent standards, however. For example, in *Strong v. United States*, a plaintiff alleged that on a particular date, his wife, an IRS employee, was informed that "in the Lafayette office of the IRS, plaintiff's tax information was being 'openly and illegally discussed and gossiped about by agents and the employees of the IRS due to her relationship with him.'" No. 98-1452, 1998 WL 990581, at *3 (W.D. La. Dec. 10, 1998). The court held that even though the complaint did "not specify who made the alleged improper disclosures to whom, what information was disclosed, and when disclosures were made," "there [we]re sufficient facts from which the Government can infer and [be] put on notice of the elements of a claim of wrongful disclosure under section 7431." 1998 WL 990581, at *2–*3. Here, Plaintiffs have alleged even more specific information than the plaintiff in *Strong*. The Government knows to whom the tax return information was allegedly revealed and can also estimate around when this information was revealed to him: Spring of 2015. As such, the Government will know exactly whom to turn to—Mr. Dietrich—in order to formulate a defense and gather evidence to rebut this claim. *See Fostvedt*, 824 F. Supp. at 986 (discussing the importance of clear pleadings to allow defendants to effectively conduct discovery and defend

themselves). Because "Plaintiff[s'] complaint is not so indefinite that the Government cannot respond to plaintiff's pleading," and the dates on which such disclosures took place are peculiarly within the Government's control, the Court finds that Count VI was sufficiently pleaded.

Count VII, however, is supported with too few facts to put the Government on notice of which unlawful disclosures Plaintiffs are challenging. Plaintiffs recount that in January 2017, once Government Agency's parent agency, which Bancroft refers to as Organization, learned that Bancroft was a bidder for a "sole-source contract," Organization declined to enter into a contract with Bancroft because "Organization had been made aware of the IRS audit," and had been told "that the IRS was going to shut down Bancroft[] and that Bancroft's reputation involved a troublesome history of audits." 2d Am. Compl. ¶ 96. Bancroft believes that Organization heard these rumors from Government Agency employees but does not specify who at Government Agency shared these rumors with Organization employees, or which Organization employees were the ones informed. *See id.* ¶ 97. Plaintiffs further allege that "Government Agency even admitted in a statement provided to the IRS that Government Agency employees discussed Bancroft's tax return information with nine individuals, some of whom work in different parts of government than the Government Agency." *Id.* ¶ 98. These individuals included "management-level staff in a procurement entity, who were well-positioned to make decisions about Bancroft's eligibility to receive government contracts." *Id.* ¶ 99. Bancroft does not specify what tax return information was shared with these nine individuals. *Id.* ¶¶ 98–99.

These allegations are too sparse to give the Government sufficient notice of Plaintiffs' claims. Not only do these allegations lack details of who disclosed the tax return information, to

whom, and when, they do not even disclose where in the Government these individuals work.[3]

While it might be possible for the Government to patch together the identities of the agencies to

which Plaintiffs are referring by consulting with the Department of Justice or the FBI, at this

point the Government has little indication of who in these mystery agencies disclosed

information about Plaintiffs, apart from a single list with individuals' first names and the first

initials of their last names. *See* ECF No. 18 at 5. Additionally, Plaintiffs have not specified in any

way what tax return information was shared with the nine undisclosed government employees.

2d Am. Comp. ¶ 98–99. There is simply too little detail here to give Defendants any notice of

which actions Plaintiffs are challenging, or how Defendants might be able to rebut these claims.

*See Fostvedt*, 824 F. Supp. at 986 ("Based on [the plaintiff's] conclusory, nebulous claim, the

United States can have no way of knowing what discovery it should produce.") For this reason,

the Court dismisses Count VII of Plaintiffs' Second Amended Complaint.

### 3. Section 6103's Exceptions

The Government next contends that in order to survive the motion to dismiss, Plaintiffs

"must allege facts showing that a disclosure was *unauthorized*—that is, that the disclosure

violated § 6103." Defs.' Mot. at 16 (citing *Welborn v. IRS*, 218 F. Supp. 3d 64, 83 (D.D.C.

2016)).[4] The Government claims that Counts IV, V, and VI are "merely consistent with the

---

[3] Plaintiffs have explained that they did not include the names of Government Agency or its parent agency, Organization, in their Second Amended Complaint because Bancroft's relationship with these agencies is classified. *See* Pls.' Opp'n at 7 n.4, 23. However, Plaintiffs have not explained whether they have definitively determined that they have no means by which they could inform the Government in their Second Amended Complaint of which agencies they are referring to, or why, if they cannot, the Court should disregard the clear requirement that the Government be given sufficient notice of the facts surrounding the unlawful disclosures in the complaint itself. *See May*, 1992 U.S. Dist. LEXIS 16055, at *6; *see also Dean*, 2010 WL 1257792, at *5.

[4] It should be noted that the standard mentioned in *Welborn* that Defendants confidently cite to in their motion is a standard to be used following a trial on the merits of an unlawful

possibility of an unlawful disclosure," but do not establish a plausible inference that one occurred, and therefore must be dismissed. *Id.* at 17. Defendants expect too much. Plaintiffs' complaint need not plead with particularity that these disclosures were unauthorized, but rather must not, on its face, plead that they were authorized. Because the facts alleged in support of Counts IV, V, and VI do not without question demonstrate that these disclosures fell within any of § 6103's exceptions, the Court will not dismiss these counts on this ground either.

In support of Count IV, Plaintiffs allege that in July 2012, IRS counsel Elizabeth Henn contacted Assistant U.S. Attorney Malis and Deputy Chief Bratt to "request access to Plaintiffs' missing tax records." 2d Am. Compl. ¶ 74. They further allege that "Ms. Henn engaged in an extensive and detailed dialog[ue] about the audit of Bancroft with Messrs. Malis and Bratt over the course of a year, during which time she disclosed the following information:" (1) "the existence and status of the audit"; (2) "[a] Revenue Agent's prediction that Bancroft's tax-exempt status would be revoked"; (3) "[a] Revenue Agent's view that Bancroft was not being cooperative"; and (4) "specific information about Plaintiffs' accounts, transactions, and relationships with third parties." *Id.* ¶ 75. Plaintiffs preemptively explain that these "conversations were not investigative in any respect" because "the IRS was not seeking answers to any audit-related queries and instead was simply requesting access to documents." *Id.* ¶ 77.

Section 6103(k)(6) provides that "[a]n internal revenue officer . . . may, in connection with his official duties relating to any audit, . . . disclose return information to the extent that

_____

disclosure claim. *See Welborn*, 218 F. Supp. 3d at 83 (quoting *Fostvedt*, 824 F. Supp. at 983 ("In order to recover under section 7431 for violations of section 6103, a taxpayer must show by a preponderance of the evidence that: (1) the disclosure was unauthorized; (2) the disclosure was made knowingly or by reason of negligence; and (3) the disclosure violated section 6103." (internal quotations omitted) (citing *Flippo v. United States*, 670 F. Supp. 638, 641 (W.D.N.C.1987) (findings of fact and conclusions of law after a trial on the merits))).

such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of . . . liability for tax . . . ," although "[s]uch disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation." 26 U.S.C. § 6103(k)(6). IRS regulations clarify that "necessary" "does not mean essential or indispensable, but rather appropriate and helpful in obtaining the information sought." 26 C.F.R. § 301.6103(k)(6)-1(c)(1).

The first alleged disclosure in Count IV—the existence and status of the audit—may perhaps fall within this exception. After all, in 2012, Plaintiffs were still under criminal investigation, *see* 2d Am. Compl. ¶¶ 25, 41 (explaining that the investigation was ongoing from 2011 to 2013), and the IRS needed many of the documents the FBI and ICE had seized in 2011 in order to conduct its audit. *Id.* ¶ 32. It is possible that, in order to gain access to these documents, IRS counsel Elizabeth Henn contacted DOJ attorneys who might be able to provide the IRS with access to them. *See id.* ¶¶ 33, 74.

However, the Court is unable to determine whether this was Ms. Henn's motivation at this stage in the proceedings. In *True the Vote, Inc. v. IRS*, the D.C. Circuit adopted the pleading standard for § 7431 unlawful inspection claims articulated in *NorCal Tea Party Patriots v. IRS*, No. 1:13–cv–341, 2014 WL 3547369, at *11–14 (S.D. Ohio July 17, 2014). *See* 831 F.3d 551, 557–58 (D.C. Cir. 2016). In *NorCal*, "Plaintiff Groups allege[d] that Defendants inspected and shared information which they knew was irrelevant to the determination of each group's tax-exempt status." *Id.* at *13. However, even though the possibility remained that the Plaintiffs' claims were exempted from liability under §6103(h)(1), which permits "inspection by or disclosure to officers and employees of the Department of the Treasury as official duties require such inspection or disclosure for tax administration purposes," 26 U.S.C. § 6103(h)(1), the Court

found that a determination at that stage in the proceedings would be inappropriate because the "case was only at the Rule 12(b)(6) stage" and because "Plaintiff Groups den[ied] that their claim [wa]s based solely upon the improper requests for information." *Id.* While the court set forth what evidence Plaintiffs would need to present at a later stage in the proceedings in order to prove that their claim did not fall within § 6103's tax administration exception, the court found that the groups had pleaded sufficient facts to warrant the chance to collect that evidence. *Id.*

The Court sees no reason why the pleading standard for inspection claims should be any less stringent than the pleading standards for disclosure claims. As such, the Court adopts the standard endorsed in *True the Vote, Inc.* Accordingly, because Plaintiffs have alleged that none of the information Ms. Henn disclosed was disclosed for investigative purposes, the Court declines to dismiss the first portion of Count IV on this ground. *See True the Vote, Inc.*, 831 F.3d at 557–58.

The rest of the alleged disclosures in Count IV,[5] V,[6] and VI[7] are also not on their face facts that would be "appropriate and helpful" to relay in order to gain access to the records

---

[5] The rest of the alleged disclosures in Count IV are "[a] Revenue Agent's prediction that Bancroft's tax-exempt status would be revoked"; "[a] Revenue Agent's view that Bancroft was not being cooperative"; and "specific information about Plaintiffs' accounts, transactions, and relationships with third parties." 2d Am. Compl. ¶ 75.

[6] The disclosures alleged in Count V (disclosures by the IRS to employees of Government Agency) are: "most, if not all, audit activity of Bancroft, including IRS-generated documents and Bancroft's own return information," *id.* ¶ 79; the prediction that "the IRS would revoke Bancroft's tax exempt status," *id.* ¶ 81; a prediction of the audit's outcome and the claim that Plaintiffs were being uncooperative, *id.* ¶ 82; and "a discussion of (i) Bancroft's accounting system and record-keeping; (ii) whether Bancroft properly had managed federal funds; (iii) whether Bancroft used Generally Accepted Accounting Principles; and (iv) whether the Government Agency would be willing to pressure Bancroft to relinquish its tax-exempt status," *id.* ¶ 84.

[7] The disclosures alleged in Count VI (disclosures by the IRS to ICE) are: "the existence, status, scope, and anticipated outcome of the IRS audit," *id.* ¶ 89, and possibly "that the audit was expected to result in the revocation of Bancroft's tax-exempt status," *id.* ¶ 90.

needed to perform an audit. 26 C.F.R. § 301.6103(k)(6)-1(c)(1). Therefore, the Court also cannot at this time determine whether these disclosures fall within the investigative exception, or any other exception, to § 6103. Accordingly, these counts survive Defendants' motion as well.

### C. Standing

Finally, the Government challenges the Stocks' ability to claim damages for the unlawful disclosures alleged in Counts IV and VI, arguing that the facts alleged only refer to the disclosure of Bancroft's tax return information, and not the Stocks'. *See* Defs.' Mot. at 19–20. Plaintiffs respond that the case the Government cites to support its proposition that taxpayers may only sue under § 7431 for the disclosure of their own tax return information is both not controlling and only discusses the relevant principle in dicta, and that at least in Count IV, Plaintiffs claim that both the Stocks' and Bancroft's tax return information was disclosed. *See* Pls.' Opp'n at 24–25.

Section 7431 provides that when a federal employee discloses "any return or return information with respect to a taxpayer in violation of any provision of section 6103, *such taxpayer* may bring a civil action for damages against the United States." 26 U.S.C. § 7431(a)(1) (emphasis added). While *Norman E. Duquette, Inc. v. C.I.R.*, 110 F. Supp. 2d 16 (D.D.C. 2000) is not controlling, the Court agrees with its and many other courts' interpretation of the statute's clear language. *See* 110 F. Supp. 2d at 23 ("Only a taxpayer whose tax return or return information is claimed to have been improperly disclosed may bring a lawsuit under Section 7431.").

"[C]onstru[ing] the complaint liberally" and "granting the plaintiff the benefit of all inferences that can be derived from the facts alleged," *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (internal quotation marks and citation omitted), the Court observes that

Plaintiffs have alleged that some return information regarding all three Plaintiffs was disclosed by the IRS to the U.S. Attorney's Office and the Department of Justice (Count IV), while the information disclosed by the FBI and the IRS to ICE regarded only Bancroft (Count VI).

Plaintiffs allege that Ms. Henn conveyed to Mr. Malis and Mr. Bratt "specific information about Plaintiffs' accounts, transactions, and relationships with third parties." 2d Am. Compl. ¶ 75. Granting Plaintiffs all inferences that can be derived from the plural reference to "Plaintiffs'" return information, the Court reads the information as pertaining to all three taxpayers, and therefore each taxpayer has standing to recover damages if they succeed on the merits of the claim. However, the other two pieces of information that Ms. Henn conveyed—"the Revenue Agent's prediction that Bancroft's tax-exempt status would be revoked" and "the Revenue Agent's view that Bancroft was not being cooperative," *id.*—appear to only concern Bancroft's tax return information and Bancroft's audit, even if the Stocks were key participants in the IRS's audit of Bancroft. As such, the Court dismisses Mr. and Mrs. Stock's claims for the unlawful disclosure of "the Revenue Agent's prediction that Bancroft's tax-exempt status would be revoked" and "the Revenue Agent's view that Bancroft was not being cooperative," but not the disclosure of "specific information about Plaintiffs' accounts, transactions, and relationships with third parties." *Id.*

As to Count VI, Plaintiffs have conceded that "[t]o the extent the Court adopts the *Duquette* dicta, only Bancroft would be able to recover on Counts 6 and 7." Pls.' Opp'n at 24 n. 15. The Court agrees with Plaintiffs' assessment. Plaintiffs have alleged that Special Agent Dietrich was aware of the existence and status of an IRS audit, as well as its anticipated outcome. 2d Am. Compl. ¶¶ 89–90. While at the beginning of Plaintiffs' recounting of the facts pertaining to Count VI, they allege that "ICE employees also became privy to Plaintiffs' confidential tax

information as a result of unlawful disclosures," in the rest of their factual allegations, Plaintiffs only refer to Bancroft's documents, Bancroft's tax return information, and a single audit. *See id.* ¶¶ 85–90. Because Plaintiffs' factual allegations only indicate that Bancroft's tax return information was shared with Special Agent Dietrich, only Bancroft has standing to recover for this disclosure. Therefore, Mr. and Mrs. Stock's claims under Count VI are dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Partial Dismissal of Plaintiffs' Second Amended Complaint (ECF No. 42) is **GRANTED IN PART AND DENIED IN PART**. Counts III and VII of Plaintiffs' Second Amended Complaint are **DISMISSED**. The Court also dismisses Mr. and Mrs. Stock's claims in Count VI and a portion of Count IV. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 27, 2018                                    RUDOLPH CONTRERAS
                                                          United States District Judge